UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SONDRA KAYE SLATER, | ) | 1:08-CV-01185 GSA HC |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION FOR WRIT |
| | ) | OF HABEAS CORPUS |
| v. | ) | |
| | ) | ORDER DIRECTING CLERK OF COURT |
| | ) | TO ENTER JUDGMENT AND TERMINATE |
| DEBORAH L. PATRICK, Warden, | ) | CASE |
| | ) | |
| Respondent. | ) | ORDER DECLINING ISSUANCE OF |
| | ) | CERTIFICATE OF APPEALABILITY |

Petitioner, Sondra Kaye Slater,[1] is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. She is represented in this action by Hilda Scheib, Esq. The parties have voluntarily consented to exercise of Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c).

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following her conviction by jury trial on August 29, 2005, of burglary (Cal. Penal Code § 460(a)) and grand theft (Cal. Penal Code § 487(a)). See Petition at 1. Two prior strike convictions for robbery and first degree burglary were

---

[1] The petition lists Petitioner's name as "Sandra Kay Slater"; however, Respondent correctly notes that Petitioner's name is actually "Sondra Kaye Slater."

1  found to be true pursuant to Cal. Penal Code § 667(a). <u>See</u> Lodged Doc. D.[2] In addition, the court
2  found Petitioner had previously served a prison term within the meaning of Cal. Penal Code
3  § 667.5(b). On October 4, 2005, she was sentenced to an indeterminate term of thirty-five years to
4  life. <u>Id</u>.

5        Petitioner timely appealed to the California Court of Appeals, Fifth Appellate District. On
6  February 27, 2007, the judgment was affirmed in a reasoned opinion. <u>Id</u>. Petitioner then filed a
7  petition for review in the California Supreme Court. <u>See</u> Lodged Doc. E. On May 18, 2007, the
8  petition was summarily denied. <u>See</u> Lodged Doc. F.

9        On August 7, 2008, Petitioner filed a habeas petition in the Kern County Superior Court. <u>See</u>
10 Lodged Doc. G. The petition was denied on October 16, 2008. <u>See</u> Lodged Doc. H.

11       Petitioner filed the instant federal habeas petition in this Court on August 12, 2008. Petitioner
12 raises the following four claims for relief: 1) She alleges her constitutional rights under the Fifth,
13 Sixth and Fourteenth Amendments were violated when the jury was dissuaded from asking for a
14 readback of testimony; 2) Petitioner claims her Sixth and Fourteenth Amendment rights were
15 violated when the trial court failed to *sua sponte* instruct on third-party culpability; 3) She claims
16 defense counsel rendered ineffective assistance by failing to request a jury instruction on third-party
17 culpability; and 4) She claims the sentence was cruel and unusual punishment under the Eighth
18 Amendment. On March 16, 2009, Respondent filed an answer to the petition. Petitioner filed a
19 traverse on June 17, 2009.

20       **FACTUAL BACKGROUND**[3]

21       On the morning of December 16, 2004, Noble Taylor, and his wife, Pauline Taylor,
22 left their house in Bakersfield to go gambling with Pauline's brother, Fred Anderson, and Fred's wife, Riva Anderson. When they returned later that afternoon, Pauline noticed the front door of the house was standing open.

23
24       Upon entering, Noble and Pauline discovered their house had been ransacked. In the living room, all the drawers of a jewelry box had been opened and the contents spilled on the floor. In the dining room, trash and a piece of bunt cake had been thrown on the floor. In addition, four beers had been taken from the refrigerator, consumed, and discarded on the

25

26 ─────────────────

27    [2]"Lodged Doc." refers to the documents lodged by Respondent with her answer.

28    [3]The factual background is taken from the opinion of the state appellate court and is presumed correct. 28 U.S.C. § 2254(e)(1).

floor. Glass in the back door to the house had also been broken.

In Noble's bedroom, all the drawers had been opened and dumped on the floor. A jar of old coins was missing from his closet. Noble estimated the coins were worth about $100. Noble's new pair of alligator boots were also missing.

In Pauline's bedroom, the quilt on her bed had been pulled down and pieces of her jewelry were lying on top of the sheets. A gold and diamond necklace worth about $800 was missing. Pauline's new black leather jacket was also missing. Noble, who purchased the jacket for Pauline, estimated it was worth $60. An antique crystal shoe, estimated to be worth between $400 and $500, was missing. At first, Pauline thought the $1500 she kept in a suitcase in the closet for emergencies had been taken. But she later found the money in her bed when she pulled back the sheet. Also missing were four packs of cigarettes and four packs of cigars, which had been on Pauline's desk. Pauline estimated the total value of all the items taken from the house was $2000.

After deputies from the sheriff's department conducted an investigation of the house, Pauline's niece, Patricia Emmitt, started helping Pauline clean up her bedroom. While she was cleaning, Emmitt found a white purse underneath pillows on the bed. Pauline said the purse did not belong to her. Emmitt opened a wallet inside the purse and found defendant's identification card. The purse also contained checks and jewelry belonging to the Taylors.

Noble and Pauline testified they both knew defendant but had not seen her for several years. They knew defendant through Pauline's niece, Deanna Anderson (Anderson), who is the daughter of Fred and Riva Anderson. Noble testified that defendant used to live with Anderson, and that they had come over to the house a lot. Noble once gave defendant $100 as "a friend." Pauline testified that she would sometimes give defendant $20 to buy cigarettes. She also gave defendant two boxes of clothes and high-heeled shoes she could no longer wear.

Defendant called Pauline after the incident. Defendant said she was sorry but that she did not "crash" the Taylor residence.

After defendant was arrested, she was interviewed by Deputy John Wiggins of the Kern County Sheriff's Department. In her statement to Deputy Wiggins, defendant admitted that she went to the Taylor residence on December 16, 2004. She claimed that she went over to the house to get $100 from Noble. When she discovered he was not home, she became angry. She went around to the back door of the residence and pulled on the door. When she pulled on the door, the glass fell out. Defendant reached inside, unlocked the door, and went inside the house. Defendant admitted she took a black leather coat (because she was cold) and drank beer, but she denied taking any of the items which were listed as stolen.

When Deputy Wiggins asked defendant why Noble would give her $100, she responded that he was her "sugar daddy." Defendant stated she had sexual relations with Noble for about a year and she thought Pauline had found out about it.

*The defense*

Joseph Castro, a member of the technical division of the sheriff's department, took photographs of the Taylor residence after the incident and tested for fingerprints but was unable to find anything suitable.

Anderson testified that she was the one who broke into the Taylor's residence on December 16, 2004. Anderson had known defendant for approximately 30 years. Defendant was Anderson's best friend. They had also been lovers off and on for 16 years. In December

2004, they were living together. Defendant had moved in about a month earlier.

On the morning of December 16, defendant left the house and returned about an hour later. Anderson told defendant that she (Anderson) needed to make some money that day. Defendant told Anderson she did not have to make money because defendant had some. Defendant told Anderson she had gotten $100 from Noble. This news made Anderson "madder than a cat in a paper sack" because defendant had "been messin' with him a couple years before." Anderson yelled and hit defendant, who then "took off."

Anderson sat down and started drinking a large bottle of malt liquor to try to calm down. She then got on her bicycle to go over to the Taylor residence to confront Noble. On the way, she stopped at a convenient store and drank again with "a bunch of old winos" who frequent the area.

When she arrived at the Taylor residence, Anderson first went into the garage and retrieved defendant's white purse from Noble's truck. She then knocked on the back door of the house. When no one answered, she went to the front door and knocked. Anderson thought Noble was hiding from her, explaining: "... we had words a few years before, and I am sure he didn't want to hear my old dirty mouth."

Anderson then went to the backyard, where she knew they kept a big refrigerator stocked with beer. She sat and drank a beer while she waited for Noble to come out to talk to her. Anderson eventually decided to leave. But as she passed the kitchen, she heard a noise and returned to the back door. She knocked so hard that she "busted out" the glass window in the door. Anderson then reached in and went inside the house. She started yelling for Noble. Next, she went to the refrigerator and opened another beer. Anderson then saw a cake. She "slapped" her fist down into the cake and then "slung it everywhere."

Anderson, who suffers from panic disorder and chronic obstructive pulmonary disease, began to have trouble breathing. Realizing she did not have her inhalers, she became scared and thought she needed to get home. Anderson went through the house in search of the keys to Pauline's car. She tore through drawers, pulling them out and dumping them on the floor. Thinking she could call a cab, Anderson went to the closet where she knew Pauline kept an envelope with money, and took out a $20 bill. She then went to the shower and turned on the hot water, letting it run to make steam.

Anderson put the $20 back into the envelope which she had put on the bed. Because her T-shirt had gotten wet from the steam, she took a dark brown leather jacket from Pauline's closet and put it over herself. She then got her bicycle and started walking home. As she was walking home, she ran into Diane Ary. Anderson gave Ary her house keys. Ary went to Anderson's house to retrieve Anderson's inhaler while Anderson waited for Ary to return.

Anderson acknowledged that, ten years earlier, a similar break-in had occurred at the house of relatives. Defendant had entered a plea to the burglary. While defendant was awaiting sentencing, Anderson signed a declaration claiming that she was the one who had broken into the house. Anderson stated that, although she went inside without the intent to steal, she became angry and stole things from her relatives.

In this case, Anderson sent a letter to Pauline asking her not to air family business in court and to forgive defendant for getting involved with her husband. The fourth line of the letter stated: "... I don't know what happened at your house or why, but I do know that someone should not lose their entire life over it." Anderson testified that she did not disclose her involvement in the incident to her aunt because she was ashamed. The first time Anderson claimed involvement was in August 2005, when she talked to a private investigator. Anderson acknowledged that by that time she had a "rough idea" of the evidence against defendant.

Diane Ary gave corroborating testimony concerning her meeting with Anderson on December 16, 2004. Ary testified that when they met in the street, Anderson was wearing a brown leather coat and a wet T-shirt. Anderson told Ary that she had been at her aunt and uncle's house, and that she had practically destroyed their house looking for their car keys because she had a breathing attack. Ary also testified she had seen defendant earlier that morning. Defendant was crying because she and Anderson had gotten into an argument.

When Ary was living in Florida, she suffered a felony conviction for forgery. See Lodged Doc. D.

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that she suffered violations of her rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

### II. Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that [s]he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70

(2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or

involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petition**

    **A.  Ground One - Readback of Testimony**

In her first claim, Petitioner argues her constitutional rights were violated when the trial court dissuaded the jury from requesting a readback of testimony.

This claim was presented on direct appeal to the Fifth DCA, where it was rejected in a reasoned opinion. See Lodged Doc. D. Petitioner then presented the claim to the California Supreme Court where it was summarily denied. See Lodged Docs. E and F. The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claim presented for the same reasons stated in the opinion of the Fifth DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The appellate court first set forth the relevant factual background, as follows:

*I. Right to readback of testimony*

> Defendant contends the court engaged in improper jury coercion by dissuading jurors from exercising their right under section 1138 [FN2] to have testimony read back to them in violation of her due process and jury trial rights. We reject defendant's contention.
>
> > FN2. Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

*A. Background*

Prior to opening statements and the presentation of evidence, the court instructed the jury regarding notetaking and readback of testimony, in relevant part, as follows:

"You may take notes; however, you should not permit note taking to distract you from the ongoing proceedings. Remember that you are the judges of the believability of the witnesses.

"Furthermore, notes are only an aid to memory and should not take precedence over independent recollection.

"And a juror who does not take notes should rely upon his or her independent recollection of the evidence and not be influenced by the fact that the other jurors do take notes. Notes are for the note taker's own personal use in refreshing his or her recollection of the evidence.

"And that means you can put on that pad whatever helps you refresh your recollection, if it's words, if it's numbers or if it's pictures. Because you're the only one that can consult with it at the end of this trial.

"If you get back to the jury room and you find that somebody wasn't paying attention, you can't pull out your pad and say, well, I have it written right here, because your pads and notepads are not the official record.

"The official record is the reporter's transcript.

"*Now, for those of you that have not been on a jury before, if you have a juror that wasn't paying attention and you need readback, it will take us about 45 minutes to set up the courtroom for readback. Because while you're back there deliberating, I'll be starting a new trial. I'll have new parties in here and I'll have new jurors. But I will be using the same reporter. She travels with me no matter where I go.*

"*Sometimes she's not too happy about that.*

"*But what that means is if we're in another trial and you send out a note and you have to have readback, we have to stop that proceeding. We have to clear the courtroom of all those people. She has to look up her notes. We have to bring these parties back. We have to bring you back in the courtroom. She has to take the witness stand and read back to you.*

"*And I only mention that to you, because we prefer not to-having to do that, if at all possible. Because it's a little disruptive to our operations. But we will do it, if you need it.*

"*But the way to get around that is if you take some notes, even at times, perhaps, you don't think you need to take notes, it's sometimes helpful to do that. Because, number one, we're going to have a weekend separating us here before you get back to it again; and, secondly, somebody always brings up in that jury room some little point. Somebody says, gee, I remember that. I wish I would have made a note of that.*

"*So I always encourage jurors to take notes. But, of course, be aware of the things that happen in the courtroom, also, because you have to observe all those things.*" (Italics added.)

At the end of trial, one of the final instructions given to the jury was CALJIC No. 17.43, which instructed the jurors of their right to have testimony read back to them:

> "During deliberations, any questions or requests you may have should be addressed to the Court on a form that will be supplied for that purpose.
>
> "If there is any disagreement as to the actual testimony, you have the right, if you choose, to request a readback by the reporter.
>
> "You may request a partial or a total readback, but any readback should be a fair presentation of that evidence.
>
> "If a readback of testimony is requested, the reporter will delete objections, rulings and sidebar conferences so you will hear only the evidence that was actually presented.
>
> "Please understand that counsel must first be contacted and then we take time to provide a response and continue deliberating until you are called back in the courtroom."
>
> After giving CALJIC No. 17.43, the court added: "*If you have to have a readback of any testimony that occurred yesterday, you will see our regular reporter that I have is not here today, so she won't be able to give you readback. You will have to come back on Monday to do that.*" (Italics added.)
>
> The jury deliberated for a day and a half, beginning early on a Friday afternoon, and concluding late the following Monday afternoon. On Friday, the jury requested a whiteboard, and, later, all charges, exhibits, and jury instructions. On Monday morning, the jury sent a note to the judge requesting clarification of the phrase "at time of entry" in the burglary statute. The jury did not request any readbacks of testimony during deliberations.

The appellate court then analyzed and rejected the claim:

> "Pursuant to section 1138, the jury has a right to rehear testimony and instructions on request during its deliberations. [Citations.] Although the primary concern of section 1138 is the *jury's* right to be apprised of the evidence, a violation of the statutory mandate implicates a defendant's right to a fair trial conducted '"substantially [in] accord[ance with] law."' [Citations.]"  (*People v. Frye* (1998) 18 Cal.4th 894, 1007.)
>
> Defendant contends the court's comments, set forth above in italics, improperly dissuaded the jury from exercising its right to request readbacks of testimony under section 1138 and constituted jury coercion. Defendant's contention is unavailing. The court accurately informed the jury that readbacks of testimony involve delay and can disrupt other court proceedings; it never indicated that requests for readbacks would not be honored. (Cf. *People v. Hillhouse* (2002) 27 Cal.4th 469, 506 ["Merely informing the jury of the time it may take for rehearing testimony is not impermissible jury coercion."].) Although the court encouraged jurors to take "some" notes (not "copious notes" as defendant asserts), we disagree with defendant's argument that the court's comments essentially told the jury that "it should place primary reliance on its notes and that readback was, as a matter of policy, a remedy of last resort" and that "jurors' notes should be relied upon instead to resolve factual questions." A fair reading of the court's comments is that the court was recommending notetaking as one way to help individual jurors keep their attention engaged during the trial. The court never suggested that jurors' notes could, or should, be relied on in place of jurors' recollections or to resolve disputes as to witnesses' testimony. To the contrary, the court stated: "If you get back to the jury room and you find that somebody wasn't paying attention, you can't pull out your pad and say, well, I have it written right here, because your pads and notepads are not the official record. [¶] The official record is the reporter's transcript."[FN3]

> FN3. The court's pretrial instructions on notetaking appear to derive largely from CALJIC No. 1.05, which states: "[You [will be] [have been] given notebooks and pencils. Leave them on your seat in the jury room when you leave each day and at each recess. You will be able to take them into the jury room when you deliberate.] [¶] [A word of caution: You may take notes; however, you should not permit note-taking to distract you from the ongoing proceedings. Remember you are the judges of the believability of witnesses.] [¶] Notes are only an aid to memory and should not take precedence over recollection. A juror who does not take notes should rely on his or her recollection of the evidence and not be influenced by the fact that other jurors do take notes. Notes are for the note-taker's own personal use in refreshing his or her recollection of the evidence. [¶] Finally, should any discrepancy exist between a juror's recollection of the evidence and a juror's notes, or between one juror's recollection and that of another, you may request that the reporter read back the relevant testimony which must prevail."
>
> Defendant notes that the court did not read the last paragraph of CALJIC No. 1.05, but she does not assert instructional error on this ground. Rather, defendant recognizes that the court was under no duty to instruct the jury on notetaking. (*People v. Marquez* (1992) 1 Cal.4th 553, 578.)
>
> Although the court suggested that readbacks necessitated solely by juror inattention might be avoided by notetaking, the court still made clear that if the jurors needed a readback on that basis, they would be accommodated: "But we will do it, if you need it." Moreover, as defendant recognizes, the court gave CALJIC No. 17.43, which properly informed the jurors of their right to have testimony read back to them in the event of "any disagreement as to the actual testimony." Finally, telling the jury that the court reporter would be unavailable to provide readbacks until the following Monday morning simply stated a fact and did not discourage the jury from requesting readbacks. The jury deliberated throughout Monday, and never requested a readback despite the fact the court made it clear they could have done so.
>
> *United States v. Criollo* (2nd Cir.1992) 962 F.2d 241, on which defendant relies, is inapposite. There, the court held "... the district court erred in announcing before jury deliberations began a prohibition against readbacks of testimony." (*Id.* at p. 244.) Nothing approaching a blanket prohibition on readbacks occurred in this case. Defendant has not shown the courts' comments here amounted to impermissible jury coercion or otherwise violated the jury's or defendant's right to have the jury provided with readbacks of testimony on request.

See Lodged Doc. D.

Respondent correctly argues that Petitioner has failed to demonstrate that the trial court's statements informing the jury that readbacks of testimony would entail certain difficulties is contrary to, or an unreasonable application of clearly established Federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). See Carey v. Musladin, 549 U.S. 70, 74 (2006). In addition, the Ninth Circuit has held that courts generally have wide latitude in determining whether to provide readbacks. United States v. Medina Casteneda, 511 F.3d 1246, 1249 (9th Cir.2008). In Medina Castaneda, the Ninth Circuit found that discouraging readbacks is not equivalent to prohibiting readbacks, and does not constitute trial error. Id. In this case, the trial court merely

informed the jury that readbacks can entail difficulties and delays. The trial court never denied the jury the right to request readbacks. On the contrary, the jury instructions informed the jury that they had the right to request readbacks. Also, the court specifically stated it would allow readbacks if requested: "But we will do it, if you need it." See Lodged Doc. D. Therefore, the claim must be denied.

### B. Ground Two - Failure to Instruct on Third-Party Culpability

In her second claim for relief, Petitioner alleges she was denied her due process rights when the trial court failed to *sua sponte* instruct the jury on third-party culpability.

This claim was also presented on direct appeal to the Fifth DCA where it was denied on the merits in a reasoned opinion. See Lodged Doc. D. It was then raised and rejected in the California Supreme Court. See Lodged Docs. E and F. The appellate court analyzed and denied the claim as follows:

> Defendant contends that because the defense was arguing that the offenses were committed by Deanna Anderson rather than defendant, the court had a sua sponte duty to instruct the jury on the defense of third party culpability. In the alternative, she claims her trial counsel was ineffective for failing to request such instruction.
>
> In *People v. Earp* (1999) 20 Cal.4th 826, 886-887 ( *Earp* ), the trial court characterized third party culpability as a defense theory that need only be pinpointed upon request and refused an instruction on third party culpability. The rejected instruction read: "'Evidence has been offered that a third party is the perpetrator of the charged offense. It is not required that the defendant prove this fact beyond a reasonable doubt. In order to be entitled to a verdict of acquittal, it is only required that such evidence raise a reasonable doubt in your minds of the defendant's guilt.'" (*Id.* at p. 887.) Our Supreme Court found any error was harmless.
>
> "Even assuming that this proposed instruction accurately pinpointed the defense theory, defendant suffered no prejudice from the trial court's refusal to give it. The jury was instructed under CALJIC No. 2.90 that the prosecution had to prove defendant's guilt beyond a reasonable doubt, and the jury knew from defense counsel's argument the defense theory that Dennis Morgan, not defendant, had committed the crimes. Under these circumstances, it is not reasonably probable that had the jury been given defendant's proposed pinpoint instruction, it would have come to any different conclusion in this case. [Citation.]" (*Earp, supra,* 20 Cal.4th at p. 887.)
>
> Similarly here, even if such instruction had been requested and refused, any failure to instruct on the theory of third party culpability was harmless. The jury was instructed, pursuant to CALJIC No. 2.90, that the prosecutor had to prove defendant's guilt beyond a reasonable doubt. Defense counsel also argued that a third party committed the crime. It is not reasonably probable defendant would have received a more favorable result had the court given an instruction on third party culpability. (*Earp, supra,* 20 Cal.4th at p. 887.) Therefore, we also reject defendant's claim she was denied effective assistance of counsel for counsel's failure to request an instruction on third party culpability.

See Lodged Doc. D.

In general, challenges to jury instructions are issues of state law and are not cognizable in a federal habeas corpus action. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982), *citing* Henderson v, Kibbe, 431 U.S. 145, 154 (1977). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. Id. In addition, the Court notes that Petitioner's burden is "especially heavy" with this claim, because "[a]n omission or an incomplete instruction is less likely to be prejudicial than a misstatement of law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

It is clear Petitioner is not entitled to federal habeas relief on this claim, because Petitioner has not demonstrated that the trial court's failure to *sua sponte* instruct the jury on third-party culpability was contrary to, or an unreasonable application of clearly established Supreme Court precedent. In addition, the trial court gave CALJIC No. 2.90, which instructed the jury that the prosecutor bore the burden of proving Petitioner's guilt beyond a reasonable doubt, and defense counsel had argued Petitioner's defense to the jury that another had committed the crime. Therefore, there is no question that the trial court's failure to instruct on third-party culpability did not have a substantial or injurious effect on the outcome of the trial. This claim must be denied.

**C.  Ground Three - Defense Counsel's Failure to Request Instruction**

Petitioner next contends that defense counsel rendered ineffective assistance by failing to request an instruction on third-party culpability. As with the previous claims, this claim was first raised on direct appeal where it was rejected on the merits. It was then raised in the California Supreme Court where it was summarily denied.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland, 466 U.S. at 687; Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  Id. at 688.  The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in

prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. Id. at 692; United States v. Cronic, 466 U.S., at 659, and n.25 (1984).

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [United States Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The habeas corpus applicant bears the burden to show that the state court applied United States Supreme Court precedent in an objectively unreasonable manner. Price v. Vincent, 538 U.S. 634, 640 (2003).

In analyzing and rejecting this claim, the appellate court determined that counsel's failure was not error and that any potential error was not prejudicial. As discussed above, the jury was fully instructed on reasonable doubt, and an instruction on third-party culpability was unnecessary. The state court rejection was not an unreasonable application of Supreme Court precedent. Accordingly, the claim must also be denied.

**D.  Ground Four - Cruel and Unusual Punishment**

In her fourth and final claim, Petitioner alleges the sentence imposed was cruel and unusual punishment under the Eighth Amendment. Like the previous claims, this claim was raised on direct appeal and denied. It was then raised and rejected without opinion in the California Supreme Court. The appellate court stated:

> Finally, defendant contends that her sentence of 35 years to life constitutes cruel and unusual punishment under the California and United States Constitutions.
>
> The People argue that defendant forfeited her claim by failing to raise it at the time of sentencing. We agree. A claim of cruel and unusual punishment not raised in the trial court is forfeited on appeal. *(People v. Norman* (2003) 109 Cal.App.4th 221, 229; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.) In any event, the claim has no merit.
>
> *A. Federal Constitution*
>
> A punishment for a term of years violates the Eighth Amendment to the United States

> Constitution if it is an "'extreme sentence[ ] that [is] "grossly disproportionate" to the crime.'" (*Ewing v.. California* (2003) 538 U.S. 11, 23 ( *Ewing* ) (plur. opn. of O'Connor, J.); *Lockyer v. Andrade* (2003) 538 U.S. 63, 72; *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (conc. opn. of Kennedy, J.).) In a noncapital case, "'successful challenges to the proportionality of particular sentences have been exceedingly rare.' [Citation.]" (*Ewing, supra,* 538 U.S. at p. 21.)
>
> In *Ewing,* the United States Supreme Court upheld application of California's three strikes law where the defendant was sentenced to a term of 25 years to life for shoplifting golf clubs worth approximately $ 1,200. (*Ewing, supra,* 538 U.S. at pp. 17-18, 30-31.) In rejecting his cruel and unusual punishment claim, the court explained that the Eighth Amendment contains a narrow "proportionality principle" applicable to noncapital sentences. However, the Eighth Amendment does not require strict proportionality between crime and sentence, but only forbids extreme sentences that are grossly disproportionate to the crime. (*Id.* at p. 23.) Here, defendant tries to minimize the seriousness of her current conduct of burglarizing the Taylor residence on the basis no one was home at the time and the offense was accomplished without the use of a weapon or violence. However, defendant's behavior during the burglary was extremely reckless and blatantly contemptuous of the victims. No room of the house appeared to escape defendant's destructive path. The evidence showed a house completely ransacked with the victims' personal belongings scattered everywhere, broken glass in the door through which defendant gained entry to the house, a refrigerator raided for beer, cake deliberately thrown on the dining room floor, and bed sheets torn down. The recklessness of defendant's offense is unquestionable, and the level of seriousness is at least that of the theft in Ewing.
>
> Defendant compares her case to several others to demonstrate that the punishment rendered by the trial court was grossly disproportionate to her crime. We do not find those cases persuasive because we do not find defendant's crime to be comparable to the offenses in those cases. In *People v. Carmony* (2005) 127 Cal.App.4th 1066, the court found a 25-year-to-life sentence to be cruel and unusual where the current offense was a "harmless technical violation of a regulatory law"-failure to register as a sex offender. (*Id.* at pp. 1072-1077.) In *Banyard v. Duncan* (C.D.Cal.2004) 342 F.Supp.2d 865, a 25-year-to-life sentence was found to be grossly disproportionate where the predicate offense was possession of a small amount of rock cocaine. (*Id.* at pp. 867-868, 878.) The Ninth Circuit, in *Ramirez v. Castro* (9th Cir.2004) 365 F.3d 755, found a 25-year-to-life sentence grossly disproportionate to a crime of petty theft (id. at pp. 756-758), and found a similar sentence grossly disproportionate to a crime of perjury in *Reyes v. Brown* (9th Cir.2005) 399 F.3d 964, 965, 968-970.)
>
> While defendant's case is similar to the above cases in that each defendant suffered from a history of repeated criminal behavior, that is where the similarity ends. Defendant's volatile conduct during the burglary of the Taylor residence posed a significant risk to society. Given the reckless nature of defendant's crime, the punishment of 35 years to life is not grossly disproportionate, nor does it constitute cruel and unusual punishment under the Eighth Amendment.

See Lodged Doc. D.

A criminal sentence that is not proportionate to the crime for which a defendant is convicted may indeed violate the Eighth Amendment. In Lockyer v. Andrade, 538 U.S. 63 (2003), the Supreme Court discussed the current state of Eighth Amendment proportionality review and held that the only clearly established governing legal principle is that a "gross disproportionality" review

applies to criminal sentences for a term of years. Id. at 72. Citing extensively to its past cases dealing with criminal sentencing and proportionality under the Eighth Amendment, the Court acknowledged that it has "not established a clear and consistent path for courts to follow." Id. The Supreme Court held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' frame work is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." Id.[4]

In Ewing v. California, 538 U.S. 11 (2003), the Supreme Court again reviewed the Supreme Court's Eighth Amendment jurisprudence, and chose to adopt Justice Kennedy's view [5] that:

> [There are] four principles of proportionality review-- the primacy of the legislature; the variety of legitimate penological schemes; the nature of our federal system; and, the requirement that proportionality be guided by objective factors– that inform the final one: The Eighth Amendment does not require strict proportionality between the crime and the sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.

Id. at 23.

In this case, the state court correctly applied clearly established Supreme Court precedent, and the state court's conclusions were objectively reasonable as Petitioner's enhanced sentence of 35 years was not grossly disproportionate to the offenses of burglary and grand theft. As noted by the appellate court, Petitioner broke into the victim's home and completely ransacked it. "No room of the house appeared to escape defendant's destructive path." See Lodged Doc. D. This crime was at least as serious of the level of the theft in Ewing. Petitioner fails to demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). The claim must be denied.

**IV. Certificate of Appealability**

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-

---

[4] The Court recognizes that other Supreme Court cases have dealt with cruel and unusual punishment. See Solem v. Helm, 463 U.S. 277 (1983); Rummel v. Estelle, 445 U.S. 263, 276 (1980). However, these cases analyze cruel and unusual punishment in the context of recidivist statutes. In this case, Petitioner was sentenced for her current conviction.

[5] As expressed in his concurring opinion in Harmelin v. Michigan, 501 U.S. 957, 1001 (1991), *citing* Solem v. Helm, 463 U.S. 277, 288 (1983).

El v. Cockrell, 123 S.Ct. 1029, 1039 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

>   (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
>   (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
>   (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
>       (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
>       (B) the final order in a proceeding under section 2255.
>
>       (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
>       (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of [her] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 123 S.Ct. at 1034; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of her case, she must demonstrate "something more than the absence of frivolity or the existence of mere good faith on [her] . . . part." Miller-El, 123 S.Ct. at 1040.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

///

///

**ORDER**

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment for Respondent; and

3) The Court DECLINES to issue a certificate of appealability.


 IT IS SO ORDERED.

**Dated:   September 21, 2009**                                 /s/ Gary S. Austin
                                                   UNITED STATES MAGISTRATE JUDGE